Knapp et al. *v.* McAuley et al.

---

*KNAPP AND BRIGGS *v.* WILLIAM McAULEY AND OTHERS.

[IN CHANCERY.]

*Railroads.   Land Damages.   Title.*

Where the owner of land across which a railroad has been surveyed and located, consents that the contractors of the road may proceed on the land before his damages are paid, and under an agreement that they shall be subsequently ascertained and paid, and the land is thereupon taken possession of by the railroad company, and the road constructed over it, the title to the land passes, and the owner retains no lien upon it for his damages; but must look for payment to the party to whom he gave credit.

The doctrine propounded in the case of *McAuley* v. *The Western Vt. R. R. Co. et al.*, 33 Vt. 311, adopted and reasserted.

---

*The bill in this cause was brought in Rutland county, but the cause was heard in the supreme court in Bennington county.

Knapp et al. *v.* McAuley et al.

BILL IN CHANCERY. The bill set forth the incorporation of the Western Vermont Railroad Company, the construction of the road, the mortgage of the same to the complainants as trustees, and the foreclosure of said mortgage; that in the original construction of the road the company took, in pursuance of the provisions of their charter, certain lands of the defendant McAuley, in Arlington, Vermont, and located and built their road thereon; that before taking said lands, McAuley agreed in writing to accept in payment therefor shares of the capital stock of the company, to an amount equal to the price of said lands, or to his damages sustained by reason of the taking thereof, so soon as they should be legally ascertained, and the lands were taken and occupied in pursuance of said contract, and on the faith thereof; that the damages were afterwards legally adjusted at $2050.; that thereupon agreeably to the requirements of the contract, shares of the capital stock to an amount equal to said damages were forthwith tendered to McAuley by said company in satisfaction of said damages and he was requested and urged to accept the same as he had agreed to do; that he refused to accept said stock, and that the same was then deposited for his benefit in the court where the judgment for said damages was entered, and there still remains subject to his order; that meanwhile and before the amount of damages was finally adjusted, the road had been constructed over said lands and fully completed, and an amount of money expended thereon far exceeding its value or the damages assessed, and permanent and expensive works and improvements had been erected thereon; that McAuley fully and expressly assented to the occupation of said land by the company, and the building thereon pending said contract, and before the assessment or adjustment of said damages; that while the road was in possession of the company, and before the same passed to the complainants, but several years after the taking of said lands and the assessment of damages, McAuley commenced an action of ejectment in his own favor against the company and Myron Clark, then in occupation of the road as lessee, in the Bennington county court, for the recovery of the lands so taken and occupied by the company; that said cause is still pending and set down for trial, and will probably be tried unless restrained by the court of chancery;

that the complainants are not parties in said suit, and have no right to interfere with or control the same ; that it was commenced long before they came into possession of the road, though not until after they had obtained a mortgage thereof, and had advanced money on the faith thereof to the full amount of the road and franchise ; that a judgment in said suit would withdraw said lands from the road, and thereby permanently break up and destroy the road, and the advantage and benefit to the public therein ; that they are advised that such judgment might be conclusive upon them, as privy thereto in estate, though not parties to said suit ; that they and those they represent as trustees, advanced their money and acquired title in the road and franchise in good faith, without knowledge or notice of the claim of McAuley, after the road had been constructed and completed over his land with his acquiescence so far as the complainants or their *cestuis que trust* knew or believed ; that no record title is necessary or usual in case of lands taken for the use of this road ; that the complainants insist that if said lands were occupied by the consent of McAuley, even without payment of his land damages, he, accepting the credit of the company therefor, is not entitled to compel such payment against the complainants ; that especially if McAuley agreed to receive payment of his damages in stock, and the same was seasonably tendered to him, they would not now be liable for any further payment of said damages ; that if McAuley *is* entitled to payment they should be permitted to pay such sum as may be justly due, and he be enjoined thereupon from prosecuting his action of ejectment, and from repossessing himself of said lands. And the complainants therefore prayed that McAuley be so enjoined, and be enjoined from all further interference with or occupation of said land, and that he be decreed to make due conveyance of the same to the complainants as trustees ; or if any sum is justly due McAuley, for which he has any lien upon said land, the complainants may be permitted by decree to pay the same when ascertained, and discharge said lands, and he be thereupon decreed to convey the same.

The defendant McAuley in his answer admits the incorporation of the company in 1845, and the amendment of their charter in 1849 ; the organization of the company in 1850, by electing directors, one

of whom was Martin C. Deming, then of Arlington, Vermont, since deceased, who had the management of the affairs of the corporation in Arlington ; admits that the road was surveyed in 1850, and was constructed in 1851 and. the fore part of the year of 1852 ; alleges that he owned a grist mill, and other buildings on what is called Roaring Branch, in Arlington, used for custom business ; that he was carrying on the marble business in North Adams, Massachusetts, and spent his time there, and came to Arlington occasionally, and remained but a day or two, once in two or three months ; that Deming applied to him to take the damages which would be done to his premises by constructing said railroad, in the capital stock of the company ; that they went together and examined his premises and he told Deming that if the road should be run eight or nine rods from his grist-mill, west of a certain elm tree, he thought it would not materially damage his mill business, but if it should run near the mill it would ; that said mill was worth $4000. ; that Deming assured this defendant he would try to have the road laid where he wished, and that this defendant then returned to Massachusetts ; that subseqently, in September, 1850, Deming told one Wm. Brown, an employee of this defendant, who worked part of the time in Arlington and a part in North Adams, to tell this defendant that the railroad was laid where he wished it, so it would not injure his mill, and that he must come up and take his land damages in the capital stock of the company as they had talked ; that the company run a line west of the elm tree, where this defendant wished the road to be built, and stuck stakes along, but soon after run another line within a few feet of his mill, which was known to Deming, at the time the last survey was made ; that about four weeks after said survey, as this defendant was going from North Adams to his mill, situated one mile north of Arlington village, where Deming resided, Deming hailed him and told him he wanted him to take his land damages in the capital stock of the company, as others would take it if he would ; that this defendant then supposing that the final survey had been made where Deming had sent word to him it was made, not having been to his mill since the aforesaid conversation with Deming, and wholly relying upon the word so sent to this defendant, did sign such a contract ;

that Deming never told or intimated to him that the line had been changed although Deming knew at the time it had been changed so as to run close to his mill; that upon arriving at his premises, he found the line had been changed, and he immediately went back to tell Deming that he would not be bound by his contract; that he did not find him until the next morning, but that he, the next morning, told him, Deming, that the road was laid so as to destroy his mill as a custom mill, and that he would not take his damages in the capital stock of the company; that he had been deceived, etc., and requested Deming to have this defendant's name taken off said contract; that the company must not enter upon his land to construct their road till his land damages were settled; that "they must not put a shovel into his land," and that he afterwards told other officers of the company the same; that when he came to Arlington in June or July, of 1851, he found they were constructing the road on his land, and told the contractor and hands to stop work, that his damages had not been settled; that they did stop and sent for one of the directors, and Lemuel Bottom, then a director, and Harmon Canfield, Esq., then the attorney of said road, came to the premises, when the defendant told them he had stopped the work because his land damages had not been settled, and that the road must not be built until his damages were paid, and after some talk about the damages they told the hands to go to work and they would bear them out in it, and they did go to work, and that this defendant again forbid them from working any more; that the above comprises in substance all that was ever said or done about his land damages; that said company did not commence to construct said road on the defendant's premises till long after said mortgage was executed and delivered, and bonds issued in the spring or summer of 1851; and this defendant admitted the calling out of commissioners in August, 1851, to appraise the defendant's damages, and that the final appraisal was $2050., with interest, but alleges that this sum had never been paid nor any part thereof; denies that the said lands were taken in pursuance of any agreement by him to take capital stock, except as above set forth; denies that any shares of stock were ever tendered to him, but admits that if they had been so tendered he should not have taken the same;

says, that said corporation failed and became utterly bankrupt on the 12th day of May, 1853, and has since remained so, and that the whole stock has not been worth a penny since that time, and if this defendant had contracted to take said stock, *which he utterly denies,* he insists it should have been furnished before the company commenced work on his premises, and then it might have been sold for half or nearly half its par value, and the certificates of stock left with the clerk of the court, were dated in December, 1854, more than six months after said stock was wholly valueless, and more than two years after said company entered upon the land; denies that he ever assented to the occupation of said lands by the company, and the construction of the road on his land before the assessment of damages, but forbid the same; denies that the trustees and bondholders took said mortgage, supposing the land damages had all been paid at the time the mortgage was given; says that the road was built within a few feet of his gristmill, and that in consequence the mill became worthless as a custom mill, and was finally burned by a spark from one of the engines of the company. The answer was traversed and testimony taken in support of the bill and answer. At the Rutland county September Term, 1866, KELLOGG, Chancellor, it was ordered and decreed that the damages as awarded at the December Term, Bennington county court, 1854, be paid the defendant McAuley with costs, within sixty days, and that on the making of such payment within said time, the injunction granted on the bill of complaint be made perpetual, and that on the failure of the complainants to make the payment within the time limited, the injunction should be dissolved and the bill dismissed as to McAuley, with costs,—and as to other defendants without costs,—from this decree the orators appealed.

A statement of other facts pertaining to this case, and a copy of the agreement signed by McAuley to take his pay for land damages in the stock of the company, may be found in the ejectment suit between the same parties as reported in 33 Vt. 311.

Knapp et al. *v.* McAuley et al.

*E. J. Phelps*, for the orators.

I. The defendant's written agreement to receive payment for his land damages in the stock of the company, and the subsequent tender to him of the stock accordingly, is a bar to any further claim on his part, unless the agreement was obtained from him by fraud.

II. No such fraud is proved. 1st. The burden is on the defendant to establish it. And his answer on this point is not responsive to the bill, and has effect therefore only as a plea. 2d. The evidence he produces, which is mainly his own, is entirely insufficient. If written contracts, after they have been accepted and executed, can be set aside upon such a charge, based upon such proof, they must cease to afford any security that can be depended upon.

III. But even if such a fraud as would invalidate the defendant's agreement, could be taken as proved, he would still have no claim upon the orators for payment of his land damages. His remedy would be against the company, for payment, and against the individuals who defrauded him, for damages.

1. No contract of any description ever existed between the defendants and the orators, nor is any fraud claimed to have been committed by them. They came in as subsequent *bona fide* purchasers of the road for value, without notice, actual or constructive, of the plaintiff's claim, and in no privity with him whatever.

2. There can be no question whatever upon the evidence, that whether his agreement to receive payment in stock was obtained by fraud or not, he not only voluntarily gave possession of his land to the company in advance of payment, and before the sum to be paid was either agreed on, or fixed by commissioners, giving them credit under his agreement for the damages, but after he discovered the alleged fraud he in no wise rescinded the license, nor objected to the continued occupation of the land. He only refused to receive his payment in stock, and claimed to be paid in money, when the amount due should be ascertained. And meanwhile acquiesced in the construction of the road over his land, and waived his right of precedent payment. On this point the answer is fully disproved. *See observations of the court on this evidence, in McAuley* v. *Western Vermont Railroad Company*, 33 Vt. p. 321-2.

Of course, if he intended to revoke the license as having been obtained by fraud, and to stand on his original right to be paid before the land was taken, he should have done it within a reasonable time after the discovery of the fraud. He could no more then than in the first place, assent to the continued occupation of his land, permit it to be made a part of a permanent and important public work, from which it cannot be withdrawn, by the expenditure upon it of an amount far beyond its value. and then recall it from the use of the public, and from the hands of innocent purchasers, on the ground that the company he trusted had become insolvent.

3. The result is therefore, that if he has any right against the orators, it must be on the ground that the charter charges all land occupied without payment, even though payment may have been expressly waived by the owner, with a perpetual lien for its value, which follows it into the hands of *bona fide* purchasers for value paid, without notice.

4. No such provision is to be found in the charter, in terms or by implication.

It will not be claimed that any lien is in terms provided for. And it is not to be supposed that so important a right would have been left to inference, where all the other provisions relating to the subject are so carefully expressed.

In the general railroad law, the provisions in regard to the taking of land are substantially the same as in this charter. And such a lien is there, as well as in the charter, expressly created in favor of unknown or non-resident land owners, whose lands are authorized to be occupied without previous payment, and without their consent. It is obvious therefore, that the general provisions of these Acts were not regarded as giving the lien here contended for. And that it was not intended to provide for it, except in the special cases above mentioned. *Expressio unius, exclusio alterius.*

The plain intent of the charter, to be gathered from its whole context, and obviously required by every consideration of public policy, and every rule of fair construction is, that the land shall be paid for before it is taken, and that the owner shall not be required to surrender it till he has received the equivalent. But if he thinks

proper to waive this right, and look to the company, that the public use and occupation of the road when once constructed and in operation should not be interrupted, though the credit he has accepted in place of the security which the law affords him, ultimately turns out unproductive.

5. Nor would there be the least propriety in such a provision, so far as the land owner is concerned. He is most amply protected by the charter. His land can in no event be occupied without previous payment, except by his own consent. But if he waive that payment there is no reason why his claim upon the corporation, on a special credit given for land damages, should stand upon any better footing than that of one who has lent them money to pay land damages.

6. Such a lien would be especially unjust as against the mortgagees, who have purchased the land and paid for it. No actual notice to them of any claim on the part of the orators is pretended. And no constructive notice is provided for by law. The location and survey of the road having been made and recorded, the easement passes by express provision of the charter, upon payment or satisfaction to the owner, which rests entirely in parol. No deed is requisite or usual, and if executed, conveys only the easement the company would have had without it; and of course the absence of a deed on record constitutes no notice of nonpayment. On the other hand, the occupation of the land by the construction of the road, affords a presumption on which under the provisions of the charter the mortgagees have a right to rely, that the owner has been paid or satisfied. Even the equitable lien upon lands for their purchase money, never followed them into the hands of a second purchaser without notice for value paid. *Manly* v. *Slason*, 21 Vt. 271; 2 Story's Eq. § 1228–9. And is now expressly abolished in all cases by statute. Stat. of 1851, p. 42.

7. The rights and interest of the public in works of this character, preclude the allowance of the lien contended for.

That a railroad is a public work and not a private speculation, is the cardinal and controlling consideration in determining questions like the present. It is upon this principle only, that the right of eminent domain can be invoked, to acquire private property for the

construction of the roads, and that the state retains in the charters not only the power of general control, but of ultimately taking possession of the roads themselves. All legislation upon the subject is based upon the paramount rights and interests of the public. And the subject under discussion is not the acquirement of title by private purchase, but the exercise by the sovereignty of the power of eminent domain.

It is obvious that if the lien claimed exists, it must be enforced at the option of the proprietor. It cannot be enforced, without putting an end to the public occupation of the road. It is the necessary consequence of a lien, that the thing charged must be appropriated or sold in the event of nonpayment. In no other way can it be effectual, and this is the decree now sought. Redf. on Railways, § 231, 232, 310 ; *McAuley* v. *Western Vt. R. R. Co.,* 33 Vt. ; *Hill* v. *Western Vt. R. R. Co.,* 32 Vt. 69 ; *Dunn* v. *N. W. R. R. Co.,* 24 Mo. 493.

The public purposes of the charters could never be answered, if the road were allowed to be incumbered by parcels, with an indefinite number of private liens, resting in parol, from the enforcement of which, constant and perhaps permanent interruption must be experienced. It is out of all reason to permit a construction of the charter which raises by *implication* a provision not contained in terms, that would so entirely defeat the object and purpose for which the charter was granted. There can be no implication, that would in its result be inconsistent with the manifest general intent.

8. No authority whatever can be produced in favor of the lien for which the defendant contends. So far as the question has passed under judicial review, the decisions have been uniform against it. The point is virtually settled by this court, in the case of *McAuley* v. *Western Vt. R. R. Co.,* above mentioned, which was a suit at law on this very claim. The reasoning and conclusion of the court are decisive against the defendant. In the unreported cases of *Hulett* v. *Knapp & Briggs, Benn. Co.,* 1863, and *Smith* v. *the same, Rut. Co.,* 1863, the majority of the whole court, after repeated arguments, held that under this charter no such lien could be enforced against the present orators. In the latter case the court were equally divided as to the judgment, one of the judges being in favor of the lien in that par-

ticular instance, on the ground that a special agreement to that effect was there proved. Three of the judges being of the opinion that even that made no difference. See also Redf. on Railways, pp. 106, 109, 110, and notes; *Water Power Co.* v. *Chamber*, 1 Stock, Ch. 471; *Hitchcock* v. *Dan. & Nor. R. R. Co.*, 25 Conn. 514; *Whittlesey* v. *Hart., Prov. & Fish. R. R. Co.*, 23 Conn. 421; *B. & M. Railway* v. *Bartlett*, 3 Cush. 220; *Miller* v. *Auburn & Sy. R. R. Co.*, 6 Hill, 61.

*A. L. Miner*, for the defendants.

I. The contract made with M. C. Deming, as to taking the land damages in the capital stock of the company, is fully proved.

1st. McAuley signed, relying upon the word Deming had sent him by Brown, and would not have signed, if he had known the line had been changed, so as to destroy his mill. This is also proved by all the circumstances in the case. It is said Deming is a man of good character. Who has questioned it? It is not pretended that he made any misrepresentations—he only withheld a fact that he ought to have disclosed, viz: that the line of the road had been changed. He honestly supposed he was not only doing the public, but McAuley, a great favor,—as he supposed the stock would be worth much more than par. That was the talk of everybody that was trying to get stock taken.

2d. This question has been settled by a jury, and their verdict approved by the supreme court. We insist that this finding by the jury ought to be conclusive in the court of chancery, and in this court.

3d. The company should have had the damages assessed, and the stock tendered, before they entered upon the land. The land holder could not call out the commissioners. (G. S. p. 219, § 17.) Their failing to have the damages assessed and the stock tendered before they entered upon the land, would have absolved McAuley from taking the stock if the contract had been a valid one. Suppose he had signed to take his damages in any other specific property, cattle or grain—must it not have been tendered to him, at the time the law requires all the damages to have been paid—or, could he not have

collected the money? The stock was not tendered till December, 1864, long after the company failed. It is true, McAuley told Mr. Canfield that he would not take the stock, but this was in the fall of 1851, after the road was nearly completed, and entirely so, over McAuley's land. He might well say then he would take nothing but money.

II. The contract being VOID in the outset, and not complied with on the part of the company, if valid, McAuley should have been paid his land damages as appraised. 1st. There was a lien upon the land for the damages;—and unless the land holder consented to the entry, expressly, or by implication, the company were trespassers in entering. *Stacey* v. *Vt. Cen. R. R.*, 27 Vt. 39 ; *McAuley* v. *Western Vt. R. R.*, 33 Vt. 311 ; Redf. on Railways, 147–150.

There was no implied assent to the entry, in this case, but if there had been, the land was holden in EQUITY for the land damages. The mortgagees had no right to suppose the land damages had been PAID, when they took their mortgage,—as the company had not commenced work on McAuley's land, and had done very little on the road when the mortgage was executed. The case of *Smith* v. *W. Vt. R. R.*, in Rutland county, and *Hulett* v. *same*, in Bennington county, ( not reported ) were not majority decisions, and were not regarded as authority.

If the decisions, dismissing those cases were made upon sound principle, there are three reasons why they are not applicable to this case,—EITHER OF WHICH ARE CONCLUSIVE.

2d. McAuley lived in Massachusetts and did not know that they were at work on his land till he forbid them. There is no proof tending to show that he did know anything about it. He swears he did not. E. B. Lathrop says he had not been in the state. The company had been at work but a few days when he came from Massachusetts and forbid them. How could there be an implied assent when he knew nothing about it? It was decided in Rutland county, in the case *Weeks, Admr.* v. *Western Vt. R. R. Co.*,—that when there was no proof, that the land holder knew of the entry upon the land—there could be no implied assent, and the damages were recovered.

3d. McAuley forbid their entering on his land, and also the ir working upon it. He told Deming the day after he signed to take his damages in stock, " that the line of the road had been changed, and the company must not enter upon his land till his damages had been settled and paid." This is denied by no one. When he came from Massachusetts, and found them at work on his land—it being the first he knew of it,—he stopped the hands, and when the attorney and one of the directors came, he told them they must work no more till his damages were paid, and the attorney in the presence of the director, told the hands to go on and he would bear them out in it. 4th. In the case *Enoch Smith against the same road*, it was alleged that the first mortgage was given in May, 1853. This was admitted in the answer—which was after the road was completed, and the company had failed. In the *Hulett* case, it did not appear when the mortgage was given. In this case, it is alleged in the answer, and proved by M. Clark's testimony, to have been given in January, 1851. This was before any work had been done on McAuley's land. There was certainly no legal supposition, that the damages had been paid, several months before the land had been entered upon. The mortgagees took their mortgage subject to this lien.

The decree of the chancellor should be affirmed. McAuley's damages, with interest and costs, should be paid. He is willing and ready to convey, when the same are paid, and so says in his answer.

The opinion of the court was delivered by

BARRETT, J. . The bill in this case asks for a perpetual injunction upon the action of ejectment which is pending in the county court in favor of said *McAuley* v. *The Western Vt. R. R. Co. and Clark.*

The case before us embodies and presents the entire subject matter of that action at law ; and, in the relation the orators sustain to that subject matter, it is conceded that they have properly resorted to the court of chancery for the adjudication and final determination of the litigation.

We adopt and reassert the doctrine propounded in the case of *McAuley* v. *The Western Vt. R. R. Co. and Clark*, 33 Vt. 311, that if the land owner foregoes his right to have his damages ascertained

and paid before the making of the road over his land is commenced, and, under some arrangement as to the subsequent ascertainment and payment of his damages, consents that the work may proceed before the damages are to be ascertained and paid, he cannot thereafter interpose and prevent the work in progress, or prevent the use of the road; nor, unless, at least, there is some special and binding contract to that effect, can he assert a lien on the land taken and occupied for the road, in the nature of a mortgage for the purchase money, or value of the land.

This is as far as we are called upon in the present case to discuss or pronounce the law, in the view that we take of the evidence, and of the conclusions of fact that we educe from it.

McAuley agreed in writing to take his damages in corporation stock. It was obviously the understanding of all concerned at the time he signed that agreement, that the ascertainment and payment of his land damages were not to be made before the work on the road through his land was to begin.

The evidence in behalf of the orators, standing by itself, would leave no doubt that the work of making the road through the defendant's land was commenced and proceeded with for a considerable time with his consent; and that, when he first forbid the workmen to proceed with the work, it was not for the reason that he had not consented to the work being begun, and thus far prosecuted; nor because he had been misled by Mr. Deming into the signing of the agreement to take his land damages in stock; nor because he had not got his pay for his damages; but it was because the Irishmen were about to spoil a valuable marble boulder that he wished and claimed the right to save and work up for his own benefit.

The defendant claims and testifies that he was misled by Mr. Deming's representations and conduct into signing that agreement; and that, as soon as he discovered the misadventure, he repudiated the agreement, and forbid to Mr. Deming anything being done on his land till his damages should be ascertained and paid.

The precise point of the alleged imposition is, that the road was to run the west side of a certain elm tree, instead of the east, as an indispensible condition to his agreeing to take his land damages in

stock; that the subject was negotiated between him and Mr. Deming on this basis; that Mr. Deming sent him word that the road had been located in conformity to his requirement; that he signed the agreement fully relying on that representation, not knowing that at that time the location of the road had been changed from the west to the east side of the elm tree; and that Mr. Deming withheld from him, at the time he signed the paper, information of such change of location. Unless these matters be found from the evidence substantially as the defendant claims them to be, his defence cannot prevail; for, unless the matter of fraud practiced on him be established, the other attendant and related facts are ineffective. The written contract must stand, unless avoided for the alleged fraud; and if it does stand, we have no difficulty in finding that the making of the road properly proceeded, with the consent of the defendant.

     *       *       *       *       *       *       *       *

( The analysis and discussion of the evidence is omitted by order of the judge.)

The contradiction the defendant encounters in Hill; the disparity between his account and that of Canfield and Cochrane as to material facts; the fact, shown by the evidence, that, aside from his own testimony, he never claimed to any body that he had been deceived as to the location of the road as bearing on his agreement to take his pay of land damages in stock; the fact that, by his own testimony, he does not appear to have made that the ground of forbidding the work on his land to proceed; the character of some parts of his testimony already commented upon; and the singularity of some of the facts testified by him in their relations and combinations, lead us not to find that he was procured to sign said agreement by any falsehood or fraudulent withholding of facts by Mr. Deming as to the location of the road.

Our belief, from all that appears in the case is, that the only point made by the defendant or condition talked about, upon which he would agree to take his land damages in stock, was, that the railroad should be located through the west village instead of East Arlington; that the word sent by Mr. Deming through Mr. Brown meant this, and the defendant so understood it, and, with this understanding,

signed said agreement. This places the defendant on the same ground and in the same position as his neighbors who signed the same agreement; this preserves a life-long good character to Mr. Deming; this saves Mr. Hall from the charge of knavery in the transaction, and of perjury as a witness; this accords truth instead of falsehood to Mr. Harmon and Mr. Cochrane; this explains and renders consistent the conduct of the defendant as to the grounds and reasons for objecting to the work proceeding on his land, and in never to any body living asserting or pretending any deception or fraud in the location of the road till° after the appraisal of the damages; this explains the defendant's answer to the 17th interrogatory, and leaves only the testimony of the defendant in other respects and that of his brother-in-law, John B. Lathrop to be reconciled with the other evidence in the case, or to be disregarded as unreliable or incredible, so far as it cannot be reconciled.

In the view we take of the law as applicable to the facts shown by the evidence, it becomes needless to consider rights that might appertain to, and be asserted by, the present orators, by reason of the relation they hold as mortgagees in trust, under a forcelosed and unredeemed mortgage. It is sufficient for the purposes of this case to permit them to stand upon the same rights as might be asserted by the corporation if the mortgage had not intervened. We hold that Mr. McAuley became obligated by valid agreement to take his land damages in stock, and that, as concurrent with said agreement, it was understood between himself and the railroad company that the making of the road through his land might be prosecuted before the appraisal and payment of the damages were made; that at some convenient time thereafter said damages were to be duly appraised in the mode prescribed in the charter and statutes; and when so appraised the amount was to be paid to him in the stock of the corporation; that in pursuance of said agreement and understanding, and with the consent of the defendant, McAuley, the making of the road through his land was commenced, prosecuted and completed, and that he became thereby entitled and bound to have his pay in said stock, and was not, and is not, entitled to any lien or claim upon the road way, as the same has been surveyed and located through his land as security

Knapp et al. *v.* McAuley et al.

for, or as a means of enforcing and realizing, the payment of said damages.

The decree of the chancellor is reversed, and the case is remanded to the court of chancery, with a mandate that by decree of said court the said defendant, McAuley, be perpetually enjoined from the further prosecution of said action of ejectment, and from all further interference with or occupation of said land, and from all disturbance of the complainants, and those holding or entitled under them, in their possession and occupation thereof for the purposes of said road, on account of any right or claim for land damages accrued by reason of the location, construction and use of said railroad through the land of said McAuley. And that the orators recover their costs of this suit, to be duly taxed and allowed against the said McAuley.